**In re Richard K. McCARTHY, District Justice In and For Magisterial District 05–4–01, Allegheny County.**

**No. 3 JD 02.**

Court of Judicial Discipline
of Pennsylvania.

May 20, 2003.

Order July 14, 2003.

Before: RALPH J. SPOSATO, P.J., BONNIE B. LEADBETTER, SAL COGNETTI, Jr., ROBERT P. HORGOS, MICHELE O'LEARY, DEBBIE O'DELL SENECA, JAMES E. BEASLEY, and JOSEPH A. HALESEY, JJ.

O'DELL SENECA, JUDGE.

## I. *INTRODUCTION*

The Judicial Conduct Board (hereinafter "Board") filed a Complaint with this Court on May 7, 2002, against District Justice Richard K. McCarthy. An Amended Complaint was filed on October 11, 2002, raising seven counts of public conduct which the Board alleged would subject the Respondent to discipline under the Pennsylvania Constitution, Article V, § 18(d)(1).

On April 17, 2003, the Board and the Respondent filed Stipulations of Fact pursuant to C.J.D.R.P. No. 502(D)(1) and a Waiver of Right to Trial. This Court accepts same as the facts necessary for disposition of this case. The Stipulations related to Respondent's conduct on nine different occasions over a two-year period from April 1999 to April 2001. The conduct was always associated with Respondent's consumption of alcoholic beverages. Counts 1 and 3 of the Board's Complaint allege that said conduct brings the judicial office into disrepute in violation of Section 18(d) of Article V of the Pennsylvania Constitution.

As a result of the foregoing Stipulations, the Board filed a Motion to Withdraw Counts 2, 4, 5, 6 and 7 without prejudice, which the Respondent joined. This Court granted the Motion on April 30, 2003.

## II. *FINDINGS OF FACT*

1. The Respondent's district court office hours are Monday through Friday, 8:30 a.m. to 4:30 p.m. The office normally closes between 12:00 p.m. and 1:00 p.m. for lunch.

2. On Thursday, April 22, 1999, Maxine Hobson, at the request of the Respondent, met the Respondent sometime between 2:00 p.m. and 3:30 p.m. at the Grant Bar in Millvale, Pennsylvania. While at the Grant Bar, the Respondent consumed approximately 3–4 alcoholic beverages, namely Perfect Manhattans. The Respondent's drink of preference is the Perfect Manhattan. Grant Bar bartenders have described a Perfect Manhattan as being comprised of 3–4 oz. of whiskey, 1/2 oz. sweet vermouth, and 1/2 oz. of dry vermouth.

3. On Thursday, April 22, 1999, sometime between 4:00 p.m. and 6:00 p.m., while still at the Grant Bar, the Respondent made unsolicited, physical contact with Hobson, which upset and offended Hobson because it was inappropriate. Ronald Hart, a bartender for the Grant Bar, observed that the Respondent exhibited commonly accepted and recognized signs of alcohol intoxication.

4. Commonly accepted and recognized signs of alcohol intoxication include a combination of the following characteristics: physical and mental impairments, such as staggering or unsteady gait, loss of fine motor coordination, slurred speech, mental confusion or slowing of reasoning process, loss of inhibitions or good judgment, an odor of alcoholic beverage emitting from the breath, and blood shot or glassy eyes.

5. On Tuesday, July 16, 1999, Robert Johns, the former father-in-law of the Respondent, entered the Grant Bar in Millvale, Pennsylvania, at approximately 2:00 p.m., and seated himself at the bar. The Respondent entered the Grant Bar at approximately 2:15 p.m., seated himself at the end of the bar, and offered to buy Johns a beer. The Respondent consumed approximately 1–3 Perfect Manhattans. The Respondent later exited the Grant Bar, but returned and a loud argument ensued between the Respondent and Johns. During the argument, the Respondent said to Johns in reference to his ex-wife's (Johns' daughter) past conduct that she was a whore. A physical altercation ensued between the Respondent and

Johns. Johns punched at the Respondent and hit him. The Respondent blocked Johns' punches by raising his arms. Bartender John Ruzomberka, Jr., positioned himself between Johns and the Respondent to stop the altercation, which did cease. Ruzomberka called the Millvale Police Department. Officers from the Millvale Police Department came to the Grant Bar, but filed no charges against either Johns or the Respondent.

6. On Wednesday, October 20, 1999, sometime between 7:00 p.m. and 9:15 p.m., the Respondent, while driving a 1987 Chevrolet Astro Van in his lane of travel from the Happy Day Lounge where he had consumed beer, collided with the left side-mirror of a 1997 Jeep Wagoneer driving in the opposite lane of travel. The 1997 Jeep Wagoneer was driven by Stacey Martinkovich; her mother, Christine Schindler, was the front seat passenger. The Respondent, after colliding with the mirror, continued driving. The Respondent then pulled over and turned his vehicle lights off. Martinkovich made a U-turn and followed the Respondent, pulling up behind him. Martinkovich exited her vehicle and approached the Respondent's vehicle. Martinkovich observed the Respondent slouched in his vehicle and advised him that he hit her vehicle. The Respondent offered to pay for the damage and gave Martinkovich his *district justice* business card (emphasis added).

7. When requested to provide his automobile insurance information, the Respondent became loud, irritated and angry. The Respondent recognized Schindler, a local bartender, and commented, "You know, Chris, your friend's a real asshole." A small crowd gathered around the vehicles and the Millvale Police Department was notified. The Respondent exhibited commonly accepted and recognized signs of alcohol intoxication. Neither Martinko-vich nor Schindler had consumed alcoholic beverages. Upon arrival, the police had the Respondent sit in the police vehicle before transporting the Respondent home. The police located the Respondent's automobile insurance information and provided it to Martinkovich. Despite Martinkovich's request, the police administered no field sobriety tests and took no breathalyzer test. The police took no statement about the incident from Martinkovich or Schindler. Instead, they dismissed Martinkovich and Schindler from the scene. No charges were filed against the Respondent.

8. On a Monday in January 2001, at approximately 3:30 p.m. or 4:00 p.m., the Respondent entered the Grant Bar and consumed 3–4 Perfect Manhattans. The Respondent fell asleep on the bar while waiting for the arrival of his girlfriend. The Respondent's girlfriend arrived at approximately 6:00 p.m. The Respondent awoke and asked if he could get another drink. Bartender Ronald Hart refused to serve the Respondent more alcohol.

9. On Wednesday, January 31, 2001, the Respondent, while at the Grant Bar, dropped his trousers and "mooned" a female friend.

10. On Friday, February 2, 2001, at approximately 3:30 p.m., the Respondent entered the Grant Bar and began consuming alcoholic beverages. At approximately 6:00 p.m., the Respondent's girlfriend arrived and began consuming alcoholic beverages. The Respondent eventually left the Grant Bar for approximately 1–1 1/2 hours before returning and ordering more alcoholic beverages. Bartender Ronald Hart refused to serve the Respondent because he exhibited commonly accepted and recognized signs of alcohol intoxication. The Respondent was upset and stated, "Wait until you need something."

11. Between 1999 and 2001, the Respondent has engaged in a course of customary conduct whereby he frequents local bar restaurant establishments, namely the Grant Bar or Skelly's Place, during and after district court business hours, to consume alcoholic beverages. The Respondent has been observed to consume alcoholic beverages over the lunch hour ,and sometimes into the afternoon prior to the end of his district court business hours at the Grant Bar or Skelly's Place. The Respondent has been observed to exhibit commonly accepted and recognized signs of alcohol intoxication on various occasions between 1999 and 2001 at the Grant Bar or Skelly's Place, as well as at various times in and about the Millvale town area. The Respondent, on various occasions between 1999 and 2001, when exhibiting commonly accepted and recognized signs of alcohol intoxication, has behaved in a manner physically and verbally inappropriate while at the Grant Bar and Skelly's Place. Some of these occasions wherein the Respondent has consumed alcoholic beverages as delineated herein have included the following:

a. On Monday, April 2, 2001, at approximately 11:50 a.m., the Respondent and a female departed from his district court office and went to Skelly's Place in Shaler Township. The Respondent consumed three (3) alcoholic beverages and departed with the female at 1:14 p.m. The Respondent returned to his office at approximately 1:19 p.m. The Respondent departed from his office at 1:35 p.m. and returned to Skelly's Place, arriving at 1:39 p.m. The Respondent consumed seven (7) more alcoholic beverages. The Respondent departed at 4:30 p.m. The Respondent arrived at his home at approximately 4:39 p.m. exited his vehicle, and exhibited commonly accepted and recognized signs of alcohol intoxication.

b. On Wednesday, April 4, 2001, at approximately 11:43 a.m., the Respondent departed from his district court office and went to Skelly's Place in Shaler Township. The Respondent consumed three (3) alcoholic beverages, namely Perfect Manhattans. At approximately 1:13 p.m., the Respondent departed and advised the bartender to leave his drink on the bar because he would be back to finish it. The Respondent returned to his district court office.

c. On Tuesday, April 17, 2001, at approximately 12:10 p.m., the Respondent and his secretary departed from his district court office and went to Skelly's Place in Shaler Township. The Respondent consumed three (3) Perfect Manhattans between 12:16 p.m. and 1:40 p.m.

12. All specific dates listed in the Stipulations of Fact falling on Monday through Friday were not holidays or days the Respondent's district court was officially closed for business.

### III. DISCUSSION

A review of the stipulated Findings of Fact establishes that Respondent repeatedly drank to the point of extreme intoxication in bars close by his district justice office, often during the hours of the normal work day when members of his community could reasonably expect that he would be conducting the business of his judicial office.[1] In addition, on these occa-

---

1. The Pennsylvania Constitution provides, in Article V, § 18(d)(1), "A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for conviction of a felony: violation of section 17 of this article; misconduct in office; neglect or failure to perform the duties of office or conduct which prejudices the proper administration of justice or *brings the judicial office into disrepute, whether or not the conduct occurred*

sions Respondent was aggressive, confrontational, and abusive, resulting, on one of the stipulated occasions, in a fistfight in a local bar. More than once local law enforcement officers were summoned requiring them to make decisions as to whether to charge this judicial officer before whom, presumably, they regularly appeared. We have no difficulty in finding that the conduct of this Respondent is so extreme as to bring the judicial office itself into disrepute in violation of Article V, § 18(d)(1). We have defined disrepute as follows:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

*In re Strock,* 727 A.2d 653, 657 (Pa.Ct.Jud. Disc.1998).

This Court has held that the conduct of a judge which results in a decline in the public esteem for that judge, may not support the conclusion that the conduct has brought the judiciary as a whole into disrepute, absent a persuasive showing by the Board that the conduct is so extreme as to have brought the judicial office itself into disrepute. *In re Smith,* 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996),

Further, this Court has found:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

*In re Cicchetti,* 697 A.2d 297, 312 (Pa.Ct. Jud.Disc.1997).

It is a serious challenge to the creativity of this Court to conceive of a course of conduct more antithetical to the reasonable expectations of the public as to the conduct of their elected judicial officers than that

*while acting in a judicial capacity or is prohibited by law;* or conduct in violation of a

described in these stipulated Findings of Fact. We will not belabor the point.

We conclude that the Board has established by clear and convincing evidence that the conduct of Respondent is such that brought the judicial office into disrepute as charged in Counts 1 and 3 of the Board's Complaint.

## IV. CONCLUSIONS OF LAW

1. The Respondent's conduct set out in the Findings of Fact is such that brings the judicial office into disrepute.

2. The Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

## O R D E R

PER CURIAM.

AND NOW, this 14th day of July, 2003, upon consideration of the testimony at a Sanction Hearing held on June 24, 2003, the stipulated evidence, and the serious nature of Respondent's conduct which brought his judicial office into disrepute, the Court hereby rejects the Recommendation of the Judicial Conduct Board and imposes the following sanctions upon Respondent:

1. That Respondent be suspended from the performance of the duties of District Justice for a period of six (6) months;

2 That the first two (2) months of the suspension are to be served without payment of compensation, except that Respondent's entitlement to medical benefits shall not be affected by this Order;

3. That the suspension from office shall commence August 1, 2003; and

canon or rule prescribed by the Supreme Court." (emphasis added)

4. That Respondent shall be on probation for one year following suspension. Said probation shall be subject to the supervision of this Court and shall be subject to the condition that Respondent report monthly to the Chief Counsel of the Judicial Conduct Board or his designee, at the times prescribed by the Judicial Conduct Board, and the Judicial Conduct Board shall file a written report monthly with this Court advising that, to its knowledge, Respondent has, or has not, been in compliance with the Rules Governing Standards of Conduct of District Justices and provisions of Article V of the Pennsylvania Constitution pertaining to the conduct of district justices.