**In re Willis W. BERRY, Common Pleas Court, First Judicial District of PA, Philadelphia County.**

**No. 1 JD 09.**

Court of Judicial Discipline of Pennsylvania.

June 25, 2009.

---

Before MUSMANNO, P.J., JUDGE,
KURTZ, JAMES, MORRIS, SHABEL,
CURRAN and ROBINSON, JJ.

OPINION BY Judge KURTZ.

## I. *INTRODUCTION*

The Judicial Conduct Board (Board) filed a Complaint with this Court on January 5, 2009 in which it charged Judge Willis W. Berry (Respondent) with engaging in conduct which brings the judicial office into disrepute, a violation of Article V, § 18(d)(1) of the Pennsylvania Constitution. The Board then averred that such conduct subjected Respondent to discipline "pursuant to the Constitution of the Commonwealth of Pennsylvania, Article V, § 17(b) and § 18(d)(1).' "[1]

On January 14, 2009, Respondent filed an Answer to the Complaint in which the factual allegations of the Complaint were mostly admitted. In his Answer Respondent requested that the Court grant him a "hearing and argument" on the issue as to whether the admitted conduct is such that brings the judicial office into disrepute. The Court denied this request on January 27, 2009 and entered an Order scheduling a Pre-Trial Conference. Respondent filed a Motion for Reconsideration of his request for "hearing and argument." This Motion was denied on February 2, 2009, by an Order in which the Court stated: "it is the intention of the Conference Judge to recommend to the Court that determination of the ultimate issues in the case be made only after the development of a complete factual record." Apparently dissatisfied with this Order, both counsel requested a conference with the Court. This was held on February 19, 2009 as a result of which, on March 16, 2009, the Board filed an Amended Complaint and the parties filed Stipulations of Fact in Lieu of Trial Pursuant to C.J.D.R.P. No. 502(D)(1).

The Amended Complaint set forth the identical allegations describing Respondent's conduct as those contained in the original Complaint; but the Board now charges Respondent with three violations. They are:

1.  violation of Article V, § 18(d)(1) of the Pennsylvania Constitution by engaging in conduct which brings the judicial office into disrepute (Count 1), (included in the original Complaint),

2.  violation of Canon 2B of the Code of Judicial Conduct by lending the prestige of his office to advance his own private interests (Count 2), (not included in the original Complaint), and

---

**1.** It is Section 18(d)(*l*) of Article V of the Constitution which provides this Court with the authority to impose discipline—*not* Section 17(b). Section 18(d)(I) provides that discipline may be imposed for certain specified conduct, including "violation of section 17 of this article." If the Board wanted to include Section 17(b), in this case, it should have charged that Respondent's conduct was "prohibited by law [and/or] violate[d] a canon of legal or judicial ethics," both of which are violations of Section 17(b), and then averred that, because of that, Respondent was subject to discipline under Section 18(d)(*l*). As it is the Board has not charged a violation of Section 17(b).

3. violation of Canon 3B(2) of the Code of Judicial Conduct by failing to require his judicial secretary, subject to his discretion and control, to observe the standards of fidelity and diligence which apply to judges (Count 3), (not included in the original Complaint).

As in the original Complaint the Board once again stated that Respondent is subject to discipline under Article V, § 17(b) and § 18(d)(1) of the Pennsylvania Constitution.[2]

As mentioned, the Board and the Respondent have submitted Stipulations of Fact in Lieu of Trial under C.J.D.R.P. No. 502(D)(1) and a waiver of trial. The Court hereby accepts those stipulations in pertinent part, recited below, as the facts necessary for the disposition of this case.

## II. *FINDINGS OF FACT*

1. This action is taken pursuant to the authority of the Board under Article V, § 18 of the Constitution of the Commonwealth of Pennsylvania, which grants the Board the authority to determine whether there is probable cause to file formal charges, and, when it concludes that probable cause exists, to file formal charges, against a justice, judge, or magisterial district judge for proscribed conduct, and to present the case in support of such charges before the Court of Judicial Discipline.

2. From January 1996 to present, and at all times relevant hereto, the Respondent has served as a Common Pleas Court Judge in Philadelphia County, Pennsylvania, with an office currently located at 1409 Criminal Justice Center, 1301 Filbert Street, Philadelphia, Pennsylvania 19107. As a Common Pleas Court Judge, he is, and at all times relevant hereto, was subject to all the duties and responsibilities imposed on him by the Code of Judicial Conduct and the Constitution of Pennsylvania.

3. Prior to becoming a judge in January 1996, Respondent had purchased several properties for investment purposes. The properties were either vacant lots, vacant buildings or occupied buildings. After becoming a judge in 1996, Respondent continued to own these properties and purchased an additional one, owning at one point a total of 16 different vacant or occupied properties. Several of the occupied buildings are multi-unit rental properties operated by Respondent.

4. Many of the properties purchased by Respondent were in poor condition and non-compliant with various safety, building and licensing codes when initially purchased, and issues concerning property condition and/or code compliance have continued to exist while under Respondent's ownership.

5. From January 1996 through and including August 2007, Respondent was issued in excess of 70 citations by the City of Philadelphia Department of Licenses & Inspections (hereinafter "L & I") for various violations of safety, building and licensing codes.

6. The various citations issued by L & I included failure to obtain or maintain the proper licenses or permits, and violations involving public nuisance, building, health and safety requirements.

7. As a result of the issuance of these citations, Respondent was required to take corrective measures to achieve compliance with the applicable code(s) or be subject to further enforcement action.

8. From January 1997 through April 2007, Respondent used his judicial office

and judicial resources, including his secretary, Carolyn Fleming (hereinafter "Fleming"), to assist him in the day-to-day operations concerning his properties.

9. During this time period, Fleming engaged in one or more of the following activities concerning Respondent's rental properties on a regular and continuing basis on behalf of Respondent, at the request of Respondent and/or with Respondent's full knowledge and complicity:

a. maintained physical files at her work station on each of Respondent's tenants, containing leases, rent payment receipts, letters and other correspondence;

b. contacted prospective or current tenants in writing or by telephone;

c. met with prospective or current tenants at the Criminal Justice Center, either in Respondent's chambers or other parts of the building, for purposes of signing leases, collecting rent or addressing other rental issues;

d. prepared lease agreements, eviction complaints, affidavits of possession, writs and other court documents relating to rental properties;

e. prepared and payments; mailed correspondence to tenants regarding delinquent rental payments;

f. filed eviction complaints, judgments and other court documents Tenant Court; at Landlord Tenant Court;

g. appeared at landlord/tenant proceedings concerning Respondent's eviction actions;

h. placed advertisements for Respondent's rental properties with local newspapers;

i. received and returned telephone calls from prospective tenants resulting from the advertisements;

j. corresponded with, and/or telephoned, utility companies which serviced Respondent's rental properties;

k. prepared and mailed payment checks to utility companies for bills relating to Respondent's rental properties;

l. prepared and made bank deposits of rental payment proceeds;

m. organized receipts relating to Respondent's properties for submission to an accountant for preparation of Respondent's tax returns.

10. Fleming engaged in one or more of the following activities concerning all of Respondent's properties (both rental and non-rental), on a regular and continuing basis, on behalf of Respondent, at the request of Respondent and/or with Respondent's full knowledge and complicity:

a. corresponded with, telephoned and/or visited L & I concerning violations issued to Respondent;

b. corresponded with, telephoned and/or visited various government offices (i.e. Water Department and Department of Revenue) for purposes of paying bills or property taxes;

c. received invoices, prepared and mailed checks for payment of various bills relating to Respondent's properties, including utility companies, construction contractors, government agencies and retail vendors.

11. The activities described in paragraphs nine (9) and ten (10) were performed by Fleming primarily at her work station in Respondent's judicial chambers between the hours of 8:30 a.m. and 4:30 p.m.

12. At times, when it was necessary for Respondent to advertise a rental vacancy, he used, or otherwise permitted, his judicial office address and/or telephone

number to be listed in classified rental advertisements, written correspondence to tenants or prospective tenants, and on rental signs.

13. While engaging in the conduct described in paragraphs nine (9) and ten (10) above, Respondent and Fleming utilized court resources, including but not limited to, computers, telephones, fax machine, paper, envelopes and postage.

## III. *DISCUSSION*

The Board' has charged that the conduct of Respondent set out in the Stipulations subjects him to discipline under Article V, § 18(d)(1)[3] of the Pennsylvania Constitution because that conduct constitutes:

1.  such that brings the judicial office into disrepute (Count 1),
2.  a violation of Canon 2B of the Code of Judicial Conduct (Count 2),
3.  a violation of Canon 3B(2) of the Code of Judicial Conduct (Count 3).

We will address. these three Counts in the order in which the Board has set them out.

### 1. Conduct which brings the judicial office into disrepute (Count 1).

This Court has been called upon frequently to decide whether particular conduct is such that—in the words of our Constitution—"brings the judicial office into disrepute." [4]

The conduct in question in these cases has been very different. For example, this Court has found the following conduct to be such that brings the judicial office into disrepute:

— sexual harassment of courthouse employee, *In re Cicchetti*, 697 A.2d 297 (Pa.Ct.Jud.Disc.1997), *aff'd*, 560 Pa. 183, 743 A.2d 431 (2000);

— failure to deposit office receipts at end of every day, *In re Strock*, 727 A.2d 653 (Pa.Ct.Jud.Disc.1998);

— angry use of "f" word in courtroom, *In re Zoller*, 792 A.2d 34 (Pa.Ct. Jud.Disc.2001);

— public drunkenness, *In re McCarthy*, 828 A.2d 25 (Pa.Ct.Jud.Disc. 2003);

— placing bogus parking tickets on cars to avoid parking meter, *In re Harrington*, 877 A.2d 570 (Pa.Ct. Jud.Disc.2005);

— calling defendants in waiting room "morons," *In re Marraccini*, 908 A.2d 377 (Pa.Ct.Jud.Disc.2006);

— fistfight at golf outing, *In re Hamilton*, 932 A.2d 1030 (Pa.Ct.Jud.Disc. 2007);

— repeatedly late for court, *In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud.Disc. 2008);

— disrespectful, demeaning behavior in courtroom, *In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud.Disc.2008);

— bizarre behavior in chambers, *In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud. Disc.2008);

— falsely accusing courthouse employee of harassment, *In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud.Disc.2008);

— use of law clerk for personal work, *In re Lokuta*, 964 A.2d 988 (Pa.Ct. Jud.Disc.2008);

— failure to recuse, *In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud.Disc.2008);

---

3. See n. 1 *supra*.

4. Pa. Const., Article V, § 18(d)(I). This section of the Constitution further provides that a judicial officer is subject to discipline for conduct which brings the judicial office into disrepute "whether or not the conduct occurred while acting in a judicial capacity or is prohibited by law."

— indicating in a campaign speech that those who contributed could expect favorable treatment in his court, *In re Singletary,* 967 A.2d 1094 (Pa.Ct.Jud.Disc.2008).

In addition, in a number of cases we have found that attempts to influence the' outcome of a case is conduct that brings the judicial office into disrepute. *In re Trkula,* 699 A.2d 3 (Pa.Ct.Jud.Disc.1997); *In re Joyce & Terrick,* 712 A.2d 834 (Pa.Ct.Jud.Disc.1998); *In re Kelly,* 757 A.2d 456 (Pa.Ct.Jud.Disc.2000); *In re Zupsic,* 893 A.2d 875 (Pa.Ct.Jud.Disc.2005).

In evaluating the conduct in each and everyone of these cases the Court has consistently applied certain principles and tests in our determinations that any particular conduct was—or was not—such that brings the judicial office into disrepute. In all cases where those holdings have been reviewed by our Supreme Court, those holdings have been affirmed. *See, In re Berkhimer,* 593 Pa. 366, 930 A.2d 1255 (2007); *In re Harrington,* 587 Pa. 407, 899 A.2d 1120 (2006); *In re McCarthy,* 576 Pa. 224, 839 A.2d 182 (2003); *In re Cicchetti,* 560 Pa. 183, 743 A.2d 431 (2000).

These principles for assessing the conduct as bringing the judicial office into disrepute were first set down in this Court's opinion in *In re Smith,* 687 A.2d 1229 (Pa.Ct.Jud.Disc.1996). There we said:

It cannot be *presumed* that a violation of any other provision, constitutional, canonical or criminal *automatically* lowers public acceptance of the authority of the judicial office. (Emphasis the Court's). *Id.* at 1238.

This Court, therefore, has never presumed that a violation automatically brings the judicial office into disrepute. See cases cited *supra.*

In *Smith* we also first enunciated the principle that:

"Disrepute" necessarily incorporates some standard with regard to the reasonable expectations of the public of a judicial officer's conduct.

This Court, therefore, has, in every case, made an assessment of what it believed the reasonable expectations of the public would be as to the judicial officer's conduct involved in the particular case.[5]

Again, in *Smith* we set down the principle, which we have consistently followed, that "the judicial officer [must have] engaged in conduct which *is so extreme*" that it brings the judicial office into disrepute. *Id.* at 1238. See cases cited *supra.*

In our opinion in *In re Cicchetti,* 697 A.2d 297 (Pa.Ct.Jud.Disc.1997) we held that:

The determination of whether particular conduct has brought the judicial office into disrepute, of necessity, is a determination which must be made on a case by case basis as the particular conduct in each case is scrutinized and weighed.

*Id.* at 312. This prescript is hardly surprising and is realistically unavoidable in determining whether particular conduct brings the judicial office into disrepute inasmuch as these cases are driven by the facts and the facts are always different.

These principles for determining whether particular conduct brings the judicial office into disrepute have been approved, indeed adopted by our Supreme Court. *See, In re Berkhimer,* 593 Pa. 366, 372–73, 930 A.2d 1255, 1258–59 (2007) and *In re*

---

**5.** Though posed as an objective standard, this is, at least to some degree, a subjective determination and is discussed *infra.*

*Cicchetti,* 560 Pa. 183, 206–07, 743 A.2d 431, 443–44 (2000).

These principles have directed our deliberations in every case where we have been called upon to decide whether particular conduct is such that brings the judicial office into disrepute and will direct us here.

It is fair to say that the difficulty in deciding these cases has not been in determining whether the conduct is "bad" or "reprehensible" or whether it makes the particular judge "look bad"; the difficulty has been in determining whether the conduct of the particular judge makes *everybody* "look bad," whether it makes judges *collectively* "look bad," whether the conduct gives *all* judges a "bad name"— whether it is such that brings the office itself into disrepute.

Inarguably this difficulty arises from a concern about how many people know about the conduct. But this can never be the test. *We* know about it and it is our constitutional duty to deal with it. On the point, we said in *In re Hamilton,* 932 A.2d 1030, 1035–36 (Pa.Ct.Jud.Disc.2007):

> It merits emphasis that this Court does not make its decisions on whether particular conduct is a violation of the Constitution as conduct which brings the judicial office into disrepute based upon the level of media coverage the conduct may attract. We do not attach any probative weight to allegations that media coverage of a particular occurrence was heavy—or that it was covered at all. In no case has this Court referred to media coverage, or the extent of it, in determining whether particular conduct was such that brought the judicial office it-

self into disrepute and, thus, was a violation of the Constitution (citations omitted). To do so would be to bestow upon the media a role in determining what is a violation of the Constitution. To do so would be to give attention to considerations incompatible, even antagonistic, to the constitutional instructions we must heed. The media prints, or broadcasts, what it considers is important for the public to know, what it considers the public will be interested in, i.e., what it considers will sell newspapers or attract listeners or viewers. These may well be legitimate considerations for the successful operation of a print or electronic media business, but, they have no place in the business of this Court.

\* \* \* \*

An even more troubling problem, and one likely to be found in a large majority of cases, is that the determination of the level of coverage to be given any particular case—rather than depending on whether a daily newspaper exists in a community or not—will be in the hands of persons making decisions which, as pointed out earlier, are driven by considerations which often may not be in consonance with the assigned mission of this Court. Simply put, it is the members of this Court who have been appointed, pursuant to the Constitution, by the Supreme Court of Pennsylvania and by the Governor of Pennsylvania, to determine those cases where conduct is so extreme as to bring the judicial office itself into disrepute—not the representatives of the media.

Moreover, although there are some cases where the conduct could be said to have occurred "in public," [6] typically the

---

**6.** *See, e.g., In re Zoller, supra:* angry use of "f" word in courtroom (but there were only five or six people in the courtroom at the time); *In re McCarthy, supra:* drunk in local bar

(perhaps a dozen customers present); *In re Berkhimer, supra:* abusive language to women employees (but there were only three or four employees in the office); *In re Marraccini,*

opposite is the case. Typically the offending judge will be trying to conceal the offending conduct. *See, e.g., In re Strock, supra,* where the district justice was taking the day's receipts to the bank—as she was required to do—except she was taking them to *her* bank and using the funds as her own until the end of the month when she would "replenish" the office account in time for the monthly report "in an ongoing scheme, secret even from her own employees." *Id.* at 657.[7]

In addition, as mentioned, we have decided numerous cases where the offending conduct is attempting to influence the outcome of cases—in the vernacular, "fixing" cases. This activity is never done in public. The actors take pains to conceal it. The activity is surreptitious, conducted in back rooms with code words and winks. Yet in everyone of these cases this Court has found that this conduct brings the judicial office into disrepute.

In making this judgment, as noted earlier, we are instructed to determine what are the "reasonable expectations of the public" respecting the conduct at issue. We did that, for example, in *In re Trkula,* 699 A.2d 3, 7 (Pa.Ct.Jud.Disc.1997), and held that:

> Certainly the reasonable expectations of the public would include the expectation that a judicial officer will not make an overt, *ex parte* attempt to influence the outcome of a case on appeal from his or her court, to the detriment of the appellant.... It would be difficult to identify conduct which would more assuredly dash public confidence in that system and in the judicial office itself.

In *In re Berkhimer, supra,* the Pennsylvania Supreme Court, Opinion by Eakin, J., reviewing this Court's conclusion that Berkhimer's conduct was such that brought the judicial office into disrepute said:

> The Court of Judicial Discipline defined disrepute as "necessarily incorporat[ing] some standard with regard to the reasonable expectations of the public of a judicial officer's conduct." *In re Strock,* 727 A.2d 653, 657 (Pa.Ct.Jud.Disc.1998). Whether particular conduct brings the judicial office into disrepute is determined on a case-by-case basis. *In re McCarthy,* 828 A.2d 25, 29 (Pa.Ct.Jud. Disc.2003).

*Id.* Addressing, then, Berkhimer's conduct, the Supreme Court said:

> When appellant interviewed Moot, he did not just elicit information from her as a potential employee; he represented the judicial office to a member of the public. Appellant's unwarranted and offensive statement during an interview reflected poorly *on the judiciary as a whole.* This event was disrespectful to the judiciary and public; combined with his offensive behavior, it brought disrepute *on the entire judiciary* (emphasis added).

*Id.* at 373,930 A.2d at 1258–59. The important feature of this holding as bearing on the question here under discussion is that the "offensive statement" was made by Berkhimer while he was *alone* with Miss Moot.

█ It is, thus, clear that our determinations of whether particular conduct is such that brings the judicial office into disrepute, are to be made *as if* "the public"

---

*supra:* calling defendants in waiting room "morons" (but there were only 15–20 people who heard it); *In re Hamilton, supra:* fistfight at golf outing (but nobody witnessed the fight). As can be seen, the fact is, even in these cases, the public's exposure to the conduct was minimal.

7. She got "caught" by a mid-month audit.

knows about it. Indeed, how can it be otherwise? How can we gauge the public's expectations respecting particular conduct unless the public knows what the conduct is?

We mention, by the way, that this approach—this exercise—is not something new or different for this Court. It is the same exercise which our Supreme Court has prescribed for us in determining whether a judge has violated Canon 3C.(2) of the Code of Judicial Conduct for failure to recuse in a case "in which [his] impartiality might reasonably be questioned."

The Supreme Court of Pennsylvania has stated that the determination of whether a judge's impartiality might reasonably be questioned—like the determination of the reasonable expectations of the public in disrepute cases—is to be an objective one. In *Commonwealth v. Darush*, 501 Pa. 15, 24, 459 A.2d 727, 732 (1983), the Supreme Court held that the trial judge should recuse when "a significant minority of the lay community could reasonably question the court's impartiality."

Since 1974, when Congress enacted revisions to the statute governing disqualification in the federal courts,[8] those courts have been employing an "objective" standard.[9] There is no doubt that is what Congress intended.[10] We have been cautious about relying on cases from other jurisdictions on matters of judicial discipline,[11] nevertheless, we have found it appropriate here because the language of the federal statute is identical to Rule 5C.(2)(a), and because the indications we have from our Supreme Court on this subject appear to be in concord with those of the federal courts. We call attention, particularly, to the case of *Pepsico v. McMillen, supra*, where the test was stated to be:

> [W]hether an objective, disinterested observer *fully informed of the facts* underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case (emphasis added).

*Id.* at 460. *See, also, Cheney v. United States District Court for the District of Columbia, supra*, at 924, 124 S.Ct. at 1399, 158 L.Ed.2d at 237 where Justice Scalia stated:

> It is well established that the recusal inquiry must be "made from the perspective of a *reasonable observer* who is *informed of all the surrounding facts and circumstances*." (Emphasis the Court's). *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302, 121 S.Ct. 25, 147 L.Ed.2d 1048 (2000) (Rehnquist, C.J.) (opinion respecting recusal) ... citing *Liteky v. United States*, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

In the *Pepsico* case Judge Posner made the observation that the court "recognize[ed] the inherently subjective character of this ostensibly objective test." *Pepsico v. McMillen*, 764 F.2d at 460.

---

**8.** *See* 28 U.S.c. § 455.

**9.** *See, e.g., Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913, 124 S.Ct. 1391, 158 L.Ed.2d 225 (2004); *Pepsico v. McMillen*, 764 F.2d 458 (7th Cir. 1985); *Home Placement Service, Inc., et al. v. Providence Journal Company*, 739 F.2d 671 (1st Cir.1984); *U.S. v. Sellers*, 566 F.2d 884 (4th Cir.1977).

**10.** *See*, Report of the House Committee on the Judiciary, H.R.Rep. No. 93–1453, 93rd Cong.2nd Sess. *Reprinted* [1974] U.S. Code Cong. & Admin.News, pp. 6351, 6354–55.

**11.** *See, In re Zupsic*, 893 A.2d 875, 894–95 (Pa.Ct.Jud.Disc.2005); *In re Toczydlowski*, 853 A.2d 24, 26 (Pa.Ct.Jud.Disc.2004); *In re Crahalla*, 747 A.2d 980, 988 (Pa.Ct.Jud.Disc. 2000).

The point is that whether the test is objective, subjective, or half and half, and whether the focus group is a "reasonable observer," "a significant minority of the lay community" or "the public," the one given is that whoever's reaction is being studied must know what they are reacting to.

With these principles in mind, we move, then, to consider whether the conduct of this Respondent, set out in the Findings of Fact, is such that brings the judicial office into disrepute. We hold that it is.

We see three aspects of the conduct which it has been admitted took place in this case. We will address these separately and then consider them collectively in determining whether the conduct is such that brings the judicial office into disrepute.

■ **First.** The admitted facts establish that this judge was operating a commercial real estate business out of his judicial chambers in the Criminal Justice Center in Philadelphia for 12 years—discontinuing the operation only when he got caught. This operation was not small or incidental—he owned a total of 16 properties, several of which were multi-unit rental properties occupied by an unspecified number of tenants. Prospective or current tenants commonly met with Respondent or his judicial secretary in Respondent's chambers or in other parts of the Criminal Justice Center for purposes of signing leases, collecting rent or addressing other rental issues. (Finding of Fact No. 9.c). At times, when it was necessary for Respondent to advertise a rental vacancy, he used, or otherwise permitted, his judicial office address and/or telephone number to be listed in classified rental advertisements, written correspondence to tenants or prospective tenants, and on rental signs. (Finding of Fact No. 12).

**Second.** The manner in which Respondent ran his business adds another dimension to his conduct which we consider in this case.

The admitted facts establish:

— that the properties owned and rented to Respondent "were in poor condition and non-compliant with various safety, building and licensing codes . . . and issues concerning property condition and/or code compliance have continued to exist while under Respondent's ownership." (Finding of Fact No. 4).

— that Respondent was issued "in excess" of 70 citations by the City of Philadelphia Department of Licensing & Inspections for various violations of safety, building and licensing codes. (Finding of Fact No. 5).

— that these citations were for failure to obtain or maintain proper licenses or permits, and for violations involving public nuisance, building, health and safety requirements. (Findings of Fact No. 6).

**Third.** Perhaps the most remarkable feature of Respondent's conduct in this case is the reality that he ran this business out of his judicial office *with absolutely no overhead.* He paid no rent for office space; he didn't have to pay for computers, telephones, file cabinets, fax machines, furniture, paper, envelopes or postage; and he didn't have to pay any salary, medical benefits or compensation of any kind to his secretary, one Carolyn Fleming (Fleming). The citizens of the Commonwealth paid all these bills. The use of Fleming's services was neither inadvertent nor inconsequential. She was the *de facto* manager of the business which she conducted on a day-to-day basis during regular business hours for 12 years from her desk in Respondent's judicial office in the Criminal Justice Center.

Fleming's activities in managing Respondent's real estate business are admitted to have been performed "on a regular and continuing basis" "on behalf of Respondent, at the request of Respondent and/or with Respondent's full knowledge and complicity."

It is admitted in Finding of Fact No. 9 that Fleming:

a. maintained physical files at her work station on each of Respondent's tenants, containing leases, rent payment receipts, letters and other correspondence;

b. contacted prospective or current tenants in writing or by telephone;

c. met with prospective or current tenants at the Criminal Justice Center, either in Respondent's chambers or other parts of the building, for purposes of signing leases, collecting rent or addressing other rental issues;

d. prepared lease agreements, eviction complaints, affidavits of possession, writs and other court documents relating to rental properties;

e. prepared and payments; mailed correspondence to tenants regarding delinquent rental payments;

f. filed eviction complaints, judgments and other court documents at Landlord Tenant Court;

g. appeared at landlord/tenant proceedings concerning Respondent's eviction actions;

h. placed advertisements for Respondent's rental properties with local newspapers;

i. received and returned telephone calls from prospective tenants resulting from the advertisements;

j. corresponded with, and/or telephoned, utility companies which serviced Respondent's rental properties;

k. prepared and mailed payment checks to utility companies for bills relating to Respondent's rental properties;

l. prepared and made bank deposits of rental payment proceeds;

n. organized receipts relating to Respondent's properties for submission to an account for preparation of Respondent's tax returns.

It is admitted in Finding of Fact No. 10 that Fleming:

a. corresponded with, telephoned and/or visited L & I concerning violations issued to Respondent;

b. corresponded with, telephoned and/or visited various government offices, (i.e. Water Department and Department of Revenue) for purposes of paying bills or property taxes;

c. received invoices, prepared and mailed checks for payment of various bills relating to Respondent's properties, including utility companies, construction contractors, government agencies and retail vendors.

We find that Respondent's active operation of a real estate business out of his judicial office, at the very least, trivializes the fundamental concept of judicial office. We find Respondent's conduct of this business and use of his judicial secretary to manage the day-to-day operation of the business demonstrated a flagrant, open, disregard for the dignity of judicial office. It also demonstrated a total disregard for the citizens of the Commonwealth, including those who elected him, by misappropriating their funds to pay his business expenses, primarily for Fleming's services. The misappropriation of Fleming's services was neither inadvertent nor inconsequential. To the contrary, the scope of the

misappropriation is broad, bold and impossible to overlook.

We find Respondent's conduct in this case to be in diametrical opposition to the reasonable expectations of the public respecting the behavior of a judicial officer and find the conduct of this judicial officer to be so extreme that it brings the judicial office into disrepute.

2. Activity Prohibited by Law Pennsylvania Constitution Article V, Section 17(b).

■ There is another very important aspect of Respondent's conduct that has not been mentioned by the Board and that is that his use of Carolyn Fleming to run his real estate business was a crime.

Section 3926(b) of the Criminal Code (18 Pa.C.S. § 3926(b)) is entitled: "Diversion of Services" and provides:

A person is guilty of theft if, having control over the disposition of services of others to which he is not entitled, he knowingly diverts such services to his own benefit or to the benefit of another not entitled thereto.

In the case of *Commonwealth v. Matty*, 422 Pa.Super. 595, 619 A.2d 1383 (Pa.Super.1993), a prison warden was convicted of violating Section 3926(b) for having a prisoner install a ceiling fan in his girlfriend's house. The conviction was upheld by the Superior Court.

Two things are important here: one is that the legislature found this conduct so objectionable that it decided to criminalize it; the other is that the enactment of that legislation means that the Respondent's conduct is "prohibited by law." This constitutes a violation of Article V, § 17(b) of the Constitution. That section provides:

(b) Justices and judges shall not engage in any activity prohibited by law.

We find that Respondent's diversion of the services of Carolyn Fleming to his own benefit is a violation of 18 Pa.C.S. § 3926(b) and thus is "activity prohibited by law" in violation of Section 17(b) of Article V of the Pennsylvania Constitution.

■ We are aware that Respondent has not been charged with a violation of Section 17(b). Any suggestion, however, that this may derogate Respondent's right to due process does not hold for, as the Supreme Court held in *In the Matter of Glancey*, 518 Pa. 276, 542 A.2d 1350 (1988) and in *In the Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473 (1988), and as we held recently in *In re Lokuta*, 964 A.2d 988 (Pa.Ct.Jud.Disc.2008), *In re Harrington*, 877 A.2d 570, 575 (Pa.Ct.Jud.Disc.2005), and *In re Berkhimer*, 877 A.2d 579, 597–98 (Pa.Ct.Jud.Disc.2005), the Board's focus on one constitutional rule and this Court's finding violation of another is not prejudicial because the underlying conduct is the same and the Respondent has been advised of what that was from the beginning of these proceedings.

3. Violation of Canon 2B of the Code of Judicial Conduct by lending the prestige of his office to advance his own private interests (Count 2).

4. Violation of Canon 3B(2) of the Code of Judicial Conduct by failing to require his judicial secretary, subject to his discretion and control, to observe the standards of fidelity and diligence which apply to judges (Count 3).

As noted above, the Board has included these counts in its Amended Complaint, averring that the conduct of Respondent is such that brings the judicial office into disrepute, in violation of Section 18(d)(*l*) of the Pennsylvania Constitution, and we have so found, but also that the same conduct was a violation of Canons 2B and 3B(2). Although the Board may have

found it advisable to include these charges, we find it unnecessary to address them.

In *In re Eagen*, 814 A.2d 304 (Pa.Ct.Jud. Disc.2002) this Court said:

> Unlike a criminal case in which the range of penalties is determined by the number of charges and the statutory sentence mandated for each offense upon which there is a finding of guilt, the scope of sanctions available to this Court is not so circumscribed. Any finding by this Court that a judicial officer has violated the Constitution of Pennsylvania or the Code of Judicial Conduct subjects that judge to the full range of appropriate discipline. Furthermore, in exercising our discretion in imposing disciplinary sanction, we are guided not by the number of ways the Respondent's conduct has offended the Constitution or Code, but by the nature of the conduct itself and any mitigating or aggravating circumstances.

*Id.* at 306–07. *See, also, In re Pazuhanich,* 858 A.2d 231, 234–35 (Pa.Ct.Jud.Disc. 2004); *In re Berkhimer,* 828 A.2d 19, 22 n. 1, 23 (Pa.Ct.Jud.Disc.2003); *In re Sullivan,* 805 A.2d 71, 74 (Pa.Ct.Jud.Disc.2002).

Accordingly, since we are satisfied that Respondent's conduct constitutes conduct which brings the office into disrepute which is a violation of Section 18(d)(1) (as well as Section 17(b)) of Article V of the Constitution, we decline to address these additional charges.

We refer briefly to the dissenting opinion of our colleague, Judge Morris, in which Judge James joins, and make the following observations.

Judge Morris' concern, as he candidly states, is driven entirely by the premise that loss of pension will result upon the concomitant occurrence of two things: one, that a sanction of removal or suspension is imposed and, two, that that sanction is imposed as a result of a finding by this Court that the judge was either convicted of a felony, engaged in conduct which brings the judicial office into disrepute or engaged in conduct which prejudices the proper administration of justice.[12] This cannot be said with any certainty whatsoever. This can only be said, as our brother has said it, if a statute specifically dealing with what happens when a judge is removed or suspended is ignored.

The statute referred to, 42 Pa.C.S.A. § 3352, was enacted a few weeks after Section 16(b) of the Constitution was amended to add the words "retirement benefits" and "deferred" to the compensation which the constitution provided was to be forfeited when a judge is removed or suspended for conviction of a felony, conduct which brings the judicial office into disrepute or prejudices the proper administration of justice. It would not be unreasonable to think that the statute was enacted to mirror the constitutional amendment. But the statute *doesn't* mirror the constitutional amendment. The statute provides:

> § 3352 Pension rights
>
> (a) General rule—Former and retired judges and district judges shall receive such compensation as shall be provided by or pursuant to statute. No salary, retirement benefit or other

---

**12.** Compensation of judges and the forfeiture thereof is dealt with in Section 16(b) of Article V of the Constitution, which provides:

Except as provided by law, no salary, retirement benefit or other compensation, present or deferred, shall be paid to any justice, judge or justice of the peace who, under section 18 or under Article VI, is suspended, removed or barred from holding judicial office for conviction of a felony or misconduct in office or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute.

compensation shall be paid to any judge or district justice who is suspended or removed from office under section 18 of Article V or under Article VI of the Constitution of Pennsylvania.

As can be seen the statute *does not limit* the forfeiture of pension to cases where the judge was convicted of a felony or his conduct was found to be such that brings the judicial office into disrepute or prejudices the proper administration of justice—forfeiture follows suspension or removal for any reason.

Inasmuch as the statute goes *further* than the constitution in forfeiting pensions, it might be thought that the statute is unconstitutional. However, that is not the case here because the clause of the constitution describing when pensions will be forfeited begins with the specific qualifying clause: "Except as provided by law ...." 42 Pa.C.S.A. § 3352 is a "law"; it deals with the forfeiture of pensions; the statute is entitled "Pension Rights," and it is *different* from the constitutional provision. Since the legislature is entitled to the presumption that it knew well what the constitution provided, when it enacted a statute with *different* provisions it logically follows that it *intended* them to be different.

Since it appears, therefore, that the statute is not unconstitutional, and is, therefore, controlling, a finding by this Court that this Respondent's conduct is such that brings the judicial office into disrepute—or not—is a non-issue on the question of loss of pension.

Assuming the statute doesn't exist,[13] a more fundamental, and more troubling feature of the dissenting opinion is that, be-cause our colleagues disagree with the constitutional provision that loss of retirement benefits shall be a consequence of removal or suspension for conduct which brings the judicial office into disrepute, they would change the definition of the conduct. They invent a new, entirely personal and greatly circumscribed definition of conduct which brings the judicial office into disrepute. They say they would reserve such a finding to cases "where a judge has shown utter and complete disdain for the concept of justice" and give as examples "corruption, prejudice against a class of litigants, or total indifference to the ideals of fairness."[14] (Dissenting Opinion, p. 1009.) The most startling thing about this declaration is that, not only is it at total variance with, but it is made without even a reference to, the holdings of this Court and, indeed, of the Supreme Court on the point.

We will limit comment to the Supreme Court cases.

In *In re Berkhimer, supra,* the Supreme Court held that offensive language spoken to and in the presence of three or four female employees was conduct which brings the judicial office into disrepute as intended by the drafters of the constitution and the electors who voted for its adoption. No one, we daresay not even our brothers of the dissent, would contend that Berkhimer's conduct showed "utter and complete disdain for the concept of justice." Nor do we think there would be any contention that Berkhimer's conduct was an example of "corruption" or that it exhibited "prejudice against a class of litigants" or "total indifference to the ideals of fairness."

---

**13.** Which, in the dissenting opinion, it doesn't.

**14.** The dissenting opinion complains that the constitutional language "conduct which brings the judicial office into disrepute" is "vague." One would be hard put to out vague this language proposed in the dissent as defining such conduct.

In *In re Harrington, supra,* the Supreme Court affirmed our holding that Harrington's conduct was such that brings the judicial office into disrepute. Harrington's conduct consisted in taking parking tickets off other cars and putting them on hers to avoid spending a quarter in the parking meter. Again, no one would seriously argue that Harrington's conduct showed "utter and complete disdain for the concept of justice," or that it comes within any definition of "corruption" or that it exhibited "prejudice against a class of litigants" or "total indifference to the ideals of fairness."

And so it is with *McCarthy, supra,* who had a habit of getting drunk in local bars; and with *Cicchetti, supra,* who was sexually harassing a female courthouse employee. In these cases, as well, the' Supreme Court affirmed holdings of this Court that the conduct of McCarthy and Cicchetti was such that brings the judicial office into disrepute.

We believe it is the obligation of the inferior courts of Pennsylvania including the Court of Judicial Discipline *to follow* the holdings of the Pennsylvania Supreme Court—not to ignore them and invent new law at variance with those holdings.[15]

Finally, we mention that, in the course of explaining the reason why they "do not believe that the conduct here justifies loss of pension," our colleagues state that this is because the Respondent "has served 12 years without prior discipline." This is a striking assertion—and quite odd given that the only reason the Respondent was able to serve 12 years with no prior discipline is because he didn't get caught for 12 years. It is unclear why our colleagues would give the Respondent credit for those 12 years as "clean" years while, at the

same time, describing his conduct—admitted to have been carried on for everyone of those 12 years—as "reprehensible"; "deplorable"; "tawdry"; "in continual violation of housing regulations"; "serious violations"; "continuous indifference to commercial regulations," all of which is said to demonstrate "a lamentable lack of appreciation of how a judge should act." (Dissenting Opinion, pp. 1008–09).

## IV. CONCLUSIONS OF LAW

1. The conduct of Respondent is such that brings the judicial office into disrepute.

2. The conduct of Respondent is a violation of Section 17(b) of Article V of the Pennsylvania Constitution.

3. The Respondent is subject to discipline under Article V, § 18(d)(1) of the Pennsylvania Constitution.

## ORDER

PER CURIAM.

AND NOW, this 25th day of June, 2009, based upon the Conclusions of Law, it is hereby

That, pursuant to C.J.D.R.P. No. 503, the attached Opinion with Findings of Fact and Conclusions of Law is hereby filed and shall be served on the Judicial Conduct Board and upon the Respondent,

That either party may file written objections to the Court's Conclusions of Law within ten (10) days of this Order. Said objections shall include the basis therefor and shall be served on the opposing party,

---

15. This is not to mention the numerous holdings of this Court on what qualifies as conduct which brings the judicial office into dis-

repute, which the dissenting judges would annul.

That, in the event that such objections are filed, the Court shall determine whether to entertain oral argument upon the objections, and, if so, issue an Order setting a date for such oral argument. If the Court determines not to entertain oral argument upon the objections, the Findings of Fact and Conclusions of Law shall become final and this Court will conduct a hearing on the issue of sanctions,

That, in the event objections are not filed within the time set forth above, the Findings of Fact and Conclusions of Law shall become final, and this Court will conduct a hearing on the issue of sanctions.

### ORDER

PER CURIAM.

AND NOW, this 15th day of July, 2009, after hearing on the issue of sanctions, it is hereby ORDERED that Respondent is suspended from his judicial office without pay for a period of four months. Respondent's medical benefits shall not be affected during the period of suspension.

This Order is effective August 16, 2009 on which date the suspension shall commence.

MUSMANNO, P.J., and ROBINSON, J., concur in the result.

Morris, Judge, files a dissenting opinion in which JAMES, Judge, joins.

DISSENTING OPINION BY Judge MORRIS.

The stipulated facts make out violations of two canons of the Code of Judicial Conduct. However, instead of finding violations of those specific rules, the majority focuses on the generic and vague offense of "bringing the judicial office into disrepute."

Under either approach, the Court could impose sanctions of suspension or removal from office. There is, however, one major difference. Under Article V, § 16(b) of the Pennsylvania Constitution, no retirement benefits shall be paid to any judge who is suspended or removed for conduct which "brings the judicial office into disrepute."

Because I do not believe that the conduct here justifies loss of pension to a judge who has served 12 years without prior discipline, because I believe that the Court should not and will not be inhibited from imposing substantial discipline in this case, and because I believe that the conduct does not equate with any rational interpretation of the relevant constitutional provisions, I respectfully dissent.

The issue here is whether the admitted conduct has brought the judicial office into "disrepute" within the meaning of Article V, § 18(d)(I) of the Pennsylvania Constitution. The issue is only important because a judge who is suspended or removed for conduct bringing the office into disrepute forfeits his or her pension. Thus, in this case, the majority has determined to put the Respondent's pension at risk before even considering the degree of punishment deserved by his conduct.[1]

Under § 18(d)(*l*), a judge may be disciplined for any of the following offenses: conviction of a felony, misconduct in office,

---

1. The anomalous effect of § 16(b) is shown by the following examples. If a judge decided cases in favor of an undisclosed relative and was removed from office under Canon 2B (allowing relationships to influence judgment) no pension loss would result. On the other hand, if a judge made an inappropriate remark and was suspended for one day for bringing the office into disrepute, he or she, under the plain wording of § 16(b) would forfeit a previously earned pension.

neglect or failure to perform the duties of office, conduct which prejudices the proper administration of justice, conduct which brings the judicial office into disrepute, breach of any of the canons contained in the Code of Judicial Conduct or any violation of Article V, § 17 (which requires full-time work as a judge and bars judges from holding political office or accepting fees for any service connected with judicial office). As can be readily seen, these categories of misconduct include both the specific and the vague. For any of these offenses, the imposable discipline runs the gamut from reprimand to removal. Thus, the Court's finding of "disrepute" is totally unnecessary to our ultimate consideration of appropriate discipline.

However, under § 16(b), an additional punishment—loss of pension—is added to any suspension or removal in three instances:

(a) conviction of a felony;

(b) conduct which prejudices the proper administration of justice; or

(c) conduct which brings the judicial office into disrepute.

Clearly, this enumeration is meant to embrace offenses more serious than the exhaustive list contained in § 18(d)(1) since otherwise the pension loss—which is the only practical effect of a finding of "disrepute"—could be simply attached to any and every example of misconduct.

What then is it that elevates sanctionable misconduct to the level of "disrepute"?[2] The majority, recognizing that actual publicity cannot properly be the measure, adopts the test of asking how people would rightly react if presented with the facts. I do not think that this test works. *Any* violation of the canons and even some non-sanctionable conduct is capable of lessening the public's respect for the judiciary. If a judge is tardy, or rude, or unprepared, or uses poor grammar, any observer will come away with a diminished view of the courts. Yet no one would suggest that such cases should involve loss of pension.[3]

I believe that the meaning of disrepute can be found in two sources. First, we can compare it to the more objective element of § 16(b)—conviction of a felony. It should be considered here that a judge who is convicted of a misdemeanor—for example drunk driving or shoplifting—could be suspended or removed from office, but would *not* forfeit his or her pension. To me, the seriousness of the specification of a felony conviction reflects the intended seriousness of meaning of the term "disrepute."

The second source of meaning can be found in the consequences of finding "disrepute"—namely the loss of a pension. The majority carefully avoids all reference to this consequence in the apparent belief that the law should be applied without regard to consequences. I believe that this is a mistake. Here, the consequences lend meaning to the term that leads to those consequences.

These considerations are consistent with this Court's clearest definition of disrepute requiring conduct "so extreme" that it brings the entire judicial office into disre-

---

**2.** Many of the majority's examples of prior cases finding disrepute are unconvincing because they did not involve suspension or removal and, therefore, no pension loss was at issue. *See, In re Singletary,* 967 A.2d 1094 (Pa.Ct.Jud.Disc.2008).

**3.** Indeed, the Judicial Conduct Board regularly and effectively deals with minor breaches by issuing "letters of caution." Similarly, this Court imposes serious sanctions for serious violations without finding "disrepute."

pute. *In re Smith,* 687 A.2d 1229 (Pa.Ct. Jud.Disc.1996).

The conduct of the Respondent is reprehensible. The operation of a "sub-prime" real estate business is a poor choice of side-line for a judge. However, it should be noted that the canons specifically permit judges to "hold and manage investments, including real estate." Pa.Code of Judicial Conduct, Canon 5C(2). More serious is the operation of the business in continual violation of housing regulations. Most serious, to my mind, is running this tawdry operation from the judicial chambers.[4] The business of renting properties frequently involves disputes—habitability, security deposits, damages, etc.—which often involve litigation or threats thereof. The tenant who has to deal with a judge in the judge's chambers, is clearly put to a disadvantage in dealing with such adversary situations. Thus, I believe that the Respondent has used the prestige of his office to advance his private interests in violation of Canon 2B. I also believe that the Respondent's regular and excessive use of his secretary to manage this business from his chambers constitutes a violation of Canon 3B(2).[5]

I consider these to be serious violations evidencing deplorable judgment, a continuous indifference to commercial regulations, and a lamentable lack of appreciation of how a judge should act. However, I do not believe that the conduct is so extreme as to bring the judicial office into disrepute within the meaning of Article V, § 18(d)(1) with consequent loss of pension. To me, the extreme end of the spectrum of misbehavior is reserved for cases where a judge has shown utter and complete disdain for the concept of justice. As examples, I would include corruption, prejudice against classes of litigants, or total indifference to the ideals of fairness.

Violations of these two canons were charged and proved in this case. Convictions on these two counts would enable the Court to impose whatever discipline it feels appropriate. Rather than addressing these specific violations, the majority focuses solely on the ill-defined concept of disrepute. Their conclusion is unnecessary to the proper disposition of this case and, I believe, both incorrect and unfair.

I respect those members of the majority who hope by their action to set a high standard of judicial conduct. I believe, however, that they draw a previously nonexistent line in the wrong place.

JAMES, Judge, joins this Dissenting Opinion.

---

4. In contrast to the Rules Governing Standards of Conduct of Magisterial District Judges (Rule 3 B bans conducting any business from the judicial office) the Code of Judicial Conduct, covering common pleas and appellate judges, contains no similar prohibition.

5. I disagree with the majority's reference to a hypothetical violation of Article V, § 17(b)— namely the supposed violation of a statute criminalizing "diversion of services." None of this was charged or even mentioned in arguments. Nor do I think the statute applies. The duties of judicial staff are largely undefined by law or practice.