# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| IN RE: DAWN A. SEGAL MUNICIPAL COURT JUDGE FIRST JUDICIAL DISTRICT PHILADELPHIA COUNTY | : : : : : : : : : : : | No. 1 EAP 2017 |
| | | Appeal from the Order dated 12/16/16 of the Court of Judicial Discipline at No. 3 JD 2015 |
| APPEAL OF: DAWN A. SEGAL | | |
| | | ARGUED: May 9, 2017 |

## *OPINION*

**CHIEF JUSTICE SAYLOR**                    **DECIDED: November 22, 2017**

This is a direct appeal in a judicial discipline case that resulted in Appellant's removal from her office as a municipal court judge in Philadelphia. The matter was consolidated, for purposes of limited oral argument only, with *In re Roca*, ___ Pa. ___, ___ A.3d ___ (2017), regarding the legal question of whether the Court of Judicial Discipline must apply the doctrine of *stare decisis* when sanctioning a jurist.

## I. Background

In 2014, amidst a federal investigation encompassing electronic surveillance of telephone conversations in which she participated, Appellant reported to the Judicial Conduct Board (the "Board") that she had *ex parte* communications with then-fellow-Municipal Court Judge Joseph Waters about several cases that were pending before her. The Board, which had already opened an investigation into the matter, proceeded to lodge a complaint against Appellant in the Court of Judicial Discipline (the "CJD"). The Board asserted violations of the then-prevailing Canons of Judicial Conduct,

including Canon 2B ("Judges should not . . . convey or knowingly permit others to convey the impression that they are in a special position to influence the judge."), Canon 3A(4) ("Judges . . . except as authorized by law, must not consider ex parte communications concerning a pending matter."), Canon 3B(3) ("Judges should take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge becomes aware."), and Canon 3C(1) ("Judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned, including but not limited to instances where . . . they have a personal bias or prejudice concerning a party[.]").  The Board also contended that Appellant violated Article V, Section 17(b) of the Pennsylvania Constitution ("Justices and judges shall not . . . violate any canon of legal or judicial ethics prescribed by the Supreme Court."), as well as the Constitution's Administration of Justice and Disrepute Clauses reposed in Article V, Section 18(d)(1) ("A justice, judge or justice of the peace may be suspended, removed from office or otherwise disciplined for . . . conduct which prejudices the proper administration of justice or brings the judicial office into disrepute[.]").[1]

## A. Stipulations

The litigants stipulated to a range of factual matters, as follows.[2]  Appellant was a municipal court judge in Philadelphia beginning in January 2010, subject to the

---

[1] The former code took effect in 1974 and was amended periodically, until it was replaced in its entirety on July 1, 2014.  Because the former code was in effect at the time of Appellant's violations, in this opinion we refer to the Code of Judicial Conduct and its canons as reflected in the former code.

[2] The factual stipulations are contained in the Board's pre-trial memorandum.  *See* Pre-Trial Memorandum of Judicial Conduct Board at 4-19 (the "Stipulation"); *see also* Pretrial Memorandum of Judge Dawn A. Segal at 4 ("All stipulations requested and agreed upon by both sides are contained in the stipulations in the Board's pre-trial memorandum.").

obligations imposed upon her by the Code of Judicial Conduct and the Pennsylvania Constitution. She became acquainted with then-municipal-judge Waters at campaign events in 2009 and came to believe he was influential in political circles.

Unbeknownst to Appellant and Waters, the FBI conducted electronic surveillance on Waters and recorded conversations between the two on September 30, 2011, as well as on June 23, June 24, June 29, July 23, and July 24, 2012. In the 2011 call, in relation to a small-claims case entitled *Houdini Lock & Safe Co. v. Donegal Investment Property Management Services*, SC-11-08-09-4192 (Phila. Mun. Ct.), Waters entreated Appellant to extend a favorable ruling to the defense, as follows:

> Waters: I got something in front of you at 1:00 today.
>
> Appellant: Okay. Tell me. What is it?
>
> Waters: The name's Donegan. Okay?
>
> Appellant: Okay.
>
> Waters: Ah, it's . . . it's something to do with an alarm company. Sammy Kuttab and Sonny Campbell will be there.
>
> Appellant: Okay. . . .
>
> Waters: You know Sam?
>
> Appellant: And who do we need? . . .
>
> Waters: [W]e got . . . the defendant, Donegan. . . .
>
> [Appellant]: Oh, okay. Okay.
>
> [Waters]: Alright?
>
> [Appellant]: Say no more. Say no more. Alright.

Stipulation ¶31.

Later that day, defense counsel in the *Houdini* matter filed a contested motion for a continuance, which Appellant granted, while directing that the case thereafter proceed to trial without further delay. *See id.* ¶¶33-34. Appellant then phoned Waters to inform him she had continued the matter, indicating that "I did the best I could." After Waters' affirmations and expression of gratitude, Appellant added that it was "[a]ll for you. Anything. Alright." *Id.* ¶36.

Pertaining to another small-claims civil case captioned *City of Philadelphia v. Rexach*, CE-12-03-73-0123 (Phila. Mun. Ct.), Waters informed Appellant that a friend had filed before Appellant a petition for reconsideration relative to Appellant's previous refusal to open a default judgment. After the two spoke further about the matter in person, they engaged in the following recorded phone conversation on July 1, 2012:

> Appellant: Hi, I figured it out and I took care of it.
>
> Waters: Oh, okay. Thank you.
>
> Appellant: I got it. Alright. It was on my um, queue, so I did it. So tell her it's done.
>
> Waters: Thank you very much . . ..

N.T., Jan. 28, 2016, at 70 & Ex. 8d.[3]

Notably, the party who was the subject of Waters' solicitation is the son of former common pleas judge Angeles Roca, the appellant in the companion case. *See* Stipulation ¶52.[4] The Stipulation reflects, however, that at the time of the conversations,

---

[3] The specific content of this discussion was not quoted in the Stipulation, but it was later adduced at trial and recited in the CJD's factual findings. *See In re Segal*, No. 3 JD 2015, *slip op.* at 16 (Pa. Ct. Jud. Disc. July 21, 2016).

[4] The circumstances of the *Rexach* matter are discussed in greater detail in *Roca*, ___ Pa. at ___, ___ A.3d at ___.

Appellant did not have a personal relationship with Roca, nor did she know that Rexach was Roca's son. It also explains that Rexach had not initially alleged a meritorious defense in his petition to open the default judgment, but he did so at the reconsideration stage. *See id.* ¶¶53-58.

On July 23, 2012, concerning a criminal case, *Commonwealth v. Khoury*, No. MC-51-CR-0018634-2012, Appellant engaged in the following recorded interchange with Waters:

> Waters: . . . Look Dawn, you got a case tomorrow with a Rich . . . eh . . . Rich Khoury. Skip Fuschino is representing him.
>
> Appellant: Okay.
>
> Waters: See if you can take a good hard look at it. He's ah . . . ah . . . ah . . . ah, a friend of mine.
>
> Appellant: Khoury is it? Khoury's a friend of yours?
>
> Waters: Yeah, Rich Khoury . . . ah . . . Skip Fuschino. Don't hurt yourself, but if you can help him, I'd appreciate it.
>
> Appellant: No, I will, if he's a friend of yours. I'll look hard at the case. Don't worry about it.

Stipulation ¶77. The following day, when Appellant presided at the preliminary hearing in the case, she downgraded the charges from felony to misdemeanor status and remanded the case for trial. Appellant then phoned Waters and, as relevant here, the following conversation ensued:

> Appellant: . . . I . . . ah . . . um . . . remanded your friend's thing.
>
> Waters: I appreciate that. You're the best.

*Id.* ¶83.

The Stipulation conveys that the recorded telephone conversations demonstrate that: Waters used his position as a judge to request special consideration for litigants in an attempt to influence Appellant's decisions; Appellant entertained the *ex parte* requests for favorable treatment; and Appellant's decisions ultimately favored those litigants. As well, Appellant did not admonish Waters to cease his entreaties, inform him she would not act on his requests, disclose the *ex parte* communications to the litigants, recuse herself from the cases, or report Waters to the judicial disciplinary system. As to all three cases, the Stipulation reflects that Appellant thought she was constrained from reporting Waters' communications due to a request from federal investigators to maintain confidentiality. It also indicates, however, that a duty to report such communications arose at the time they were made. *See id.* ¶¶44-50, 68-74, 89-95.

As the federal investigation progressed, FBI agents and federal prosecutors interviewed Appellant on several occasions, ultimately playing tapes of the intercepted conversations. Appellant spoke to federal authorities without the benefit of a proffer letter or legal protection. In June 2014, she testified before a federal grand jury without any promise of immunity or legal protection. *See id.* ¶¶9-16.

A federal prosecution of Waters was initiated, and he entered a negotiated guilty plea to mail fraud, 18 U.S.C. §1341, and honest service wire fraud, *id.* §§1343, 1346, in September 2014. *See* Stipulation ¶18 (citing *United States v. Waters*, 2:14-cr-00478 (E.D. Pa.)); *see also* N.T., Jan. 28, 2016, at Ex. 13 (embodying the information in the *Waters* case). Later that month, Appellant, through counsel, self-reported to the Board that she and Waters had had *ex parte* communications concerning pending cases. The correspondence stated that Appellant had not previously made these disclosures to the Board on account of a request from federal authorities to maintain confidentiality. In March 2015, the Board filed its complaint with the CJD. *See* Stipulation ¶¶21-24.

**B. Trial**

In January 2016, trial of the disciplinary case against Appellant proceeded before a three-judge panel of the CJD. The Board presented its case via the stipulation, supplemented by the testimony of FBI Special Agent Eric Ruona, one of the agents who had interviewed Appellant. The agent attested that, in his initial interviews with Appellant centered on the *Houdini* case, she denied any recollection of the matter. *See, e.g.*, N.T., Jan. 28, 2016, at 32. At a December 10, 2013, meeting, however, Appellant volunteered that Waters had called her about cases two or three times. *See id.* at 40. Upon further questioning, Appellant portrayed the subject of the conversations as non-substantive, and she added that she would not have made any different rulings had Waters not called. *See, e.g.*, *id.* at 41. Appellant admitted that she was uncomfortable with the calls and ultimately asked Waters to stop calling. *See id.* at 47.

Agent Ruona further explained that Appellant was first confronted with the specific content of the wiretap recordings at a May 1, 2014, interview, at which she was represented by an attorney. *See id.* at 53-54. The agent indicated that Appellant acknowledged that all of the conversations were inappropriate, that Waters was trying to influence her, and that she should have recused herself from the matters that he raised. *See, e.g.*, *id.* at 62, 66. By way of explanation, the witness continued, Appellant said that she "wanted to give [Waters] the impression that she was going to do what he wanted." *Id.* at 62, 66. Nevertheless, Appellant maintained that, in each instance, she followed her conventional judging practices and ruled in the same way she would have ruled had Waters not importuned her. *See, e.g.*, *id.* at 67.

Special Agent Ruona additionally testified, however, that at one juncture Appellant had indicated that, "if all things were equal, that it might have tipped a case in [Waters'] direction, if he was asking for it." *Id.* at 67-68. The witness further indicated

that, when the calls pertaining to the *Rexach* case were played, Appellant admitted that her tone "sounded like she was agreeing to fix cases." *Id.* at 73.

At a subsequent interview, Agent Ruona noted, Appellant explained that she was concerned about her forthcoming retention election and, believing Waters to be influential in political matters, she wished to please him; thus, she was acting as if she was doing favors for him. *See* N.T., Jan. 28, 2016, at 78-79; *accord id.* at 81. Again, however, she insisted that Waters' overtures had no impact upon her actual judicial decision-making. *See, e.g., id.* at 78. In retrospect, the agent testified, Appellant conceded that "it was foolish the way that she handled it." *Id.* at 79.

Finally, Agent Ruona stated that Appellant, somewhat inconsistently, had told him that Waters' calls "influenced me, absolutely." *Id.* at 80; *accord id.* at 87. In hindsight, he attested, Appellant acknowledged that the conversations sounded like Waters was asking her to fix cases, and she added, "In retrospect, it sounds horrible." *Id.* at 89.

After the close of the Board's case, Appellant testified in her own defense. She initially discussed her concern about the retention election, associated threats that she believed were being lodged against incumbents, and her desire to prevail. *See id.* at 184, 197. She said that she was shaken by Waters' calls, but given his perceived ability to aid her in her retention efforts, she "wanted him to think that he had – that his call had influenced me, but it hadn't influenced me. I think I just wanted him to think that I – that he had gotten through to me, when he hadn't." *Id.* at 190-91. Consistent with various of her statements to the federal authorities, Appellant maintained that she followed her own procedures throughout and did not render any decision in any pending case that she would not have made in any event. *See, e.g., id.* at 191, 197 ("I'm just going to do the right thing and hope that this goes away."). In this regard, Appellant adamantly

denied ever having told Agent Ruona that she considered "tipping" a decision in a close case. *See id.* at 212.

Appellant nonetheless pervasively acknowledged the wrongfulness of her conduct. For example, she testified:

> I was wrong. I should have reported [Waters]. I should have said, don't ever call me again. This is wrong. I didn't do that. I should have recused myself.

*Id.* at 191; *see also id.* at 198-99, 216, 245. She also testified that, after the third set of calls, she told Waters not to call again. *See, e.g., id.* at 198. Although she repeatedly conceded that she should have taken action earlier, Appellant stated that some of the delay was accounted for by a request for confidentiality from federal officials. *See id.* at 215.

Finally, Appellant presented six character witnesses, some of whom also testified about the circumstances of the cases that were the subject of the recorded conversations. The purport of this latter testimony was to suggest that the rulings were either correct or, at least, were rendered in good faith.[5]

Soon after the trial, the CJD suspended Appellant from her judicial duties on an interim basis without pay.

## C. Decisions

The CJD issued an opinion determining that Appellant committed all charged violations. *See In re Segal*, No. 3 JD 2015, *slip op.* (Pa. Ct. Jud. Disc. July 21, 2016) ("Segal (Findings)"). Its findings of fact tracked the Stipulation, supplemented with descriptions of the trial testimony, although it did not make specific credibility rulings

---

[5] Appellant has conceded that she made an error of law in her ruling relative to the criminal case.

about some matters in factual controversy, such as whether Appellant ever stated that she might "tip" a close case in a litigant's favor in response to Waters' entreaties.

In its discussion, the court began with Canon 2B's proscription against judges knowingly permitting others to convey the impression that they are in a special position to influence the judge. The CJD recounted that Appellant engaged in *ex parte* communications with Waters on multiple occasions, listened to his requests, asked pertinent questions of him, found for the favored parties while subject to an undisclosed taint, and called Waters afterwards to advise him of her compliance. Thus, the CJD concluded that Appellant conveyed to Waters that he was in a position to influence her, thereby failing to fulfill Canon 2B's requirements. *See id.* at 27.

The court applied a similar rationale relative to Canon 3A(4)'s provision that judges must not consider *ex parte* communications concerning a pending matter. It noted that there is no requirement "that the 'consideration' given to the *ex parte* requests be determinative of the errant judge's decision . . .. All that is required is that the *ex parte* communication be considered which it obviously was here." *Id.* at 28. Therefore, the CJD found Appellant in violation of Canon 3A(4).

Next, the CJD discussed Appellant's violation of her responsibility, under Canon 3B(3), to report Waters' misconduct to disciplinary authorities. The court explained that Appellant could have rendered a report long before federal authorities requested confidentiality. *See id.* at 29 (highlighting that Appellant "first met with [the federal prosecutor who requested confidentiality] on December 10, 2013, more than two years after the *ex parte* communications in *Houdini* and approximately one and one-half years after the *ex parte* communications in *Rexach* and *Khoury*").

In terms of a judge's obligation to recuse under Canon 3C(1), the CJD reasoned that Appellant's impartiality could reasonably be questioned in each of the cases

discussed in the recorded conversations because Waters asked for special consideration for certain litigants, and Appellant told him they would be so favored. The court noted that, after Waters' entreaties, Appellant knew the names of the favored parties in the upcoming proceeding. It again highlighted Appellant's efforts, after those proceedings, to advise Waters about her rulings. *See id.* at 31 ("All of these statements demonstrate an appearance of bias or prejudice in favor of certain parties in the *Houdini*, *Rexach* and *Khoury* cases and give rise to significant, reasonable questions about Respondent Segal's ability to be impartial in ruling on those matters.").

Based on the above infractions, the CJD found a derivative violation of the Constitution's prohibition against disobeying canons of judicial ethics. *See* PA. CONST. art. V, §17(b). Furthermore, the CJD discerned a violation of the Constitution's Administration of Justice Clause, *see id.* §18(d)(1), in that Appellant's failure to disclose the *ex parte* communications deprived opposing parties of the opportunity to challenge her ability to be fair and impartial and to request recusal. *See Segal (Findings)*, *slip op.* at 32-33 ("When Respondent Segal actively listened to Waters' *ex parte* requests for special consideration, when she presided over the three cases instead of disqualifying herself, and when she placed the *ex parte* follow-up calls to Waters to report the posture of the still-pending proceedings in *Houdini*, *Rexach* and *Khoury*, Respondent Segal interfered with the systematic operation or normal functions of the Municipal Court and thereby affected the proper administration of justice."); *accord In re Segal*, No. 3 JD 2015, *slip op.* at 8 (Pa. Ct. Jud. Disc. Sept. 23, 2016) (opinion on post-verdict motions) ("A judge repeatedly agreeing with another judge to find in favor of a party on three separate occasions and assuring him of her compliance unquestionably defies 'the reasonable expectations of the public of a judicial officer's conduct.'" (quoting *In re Carney*, 621 Pa. 476, 501, 79 A.3d 490, 494 (2013))).

The CJD recognized an obligation, on its part, to consider whether Appellant acted knowingly. *See Segal (Findings), slip op.* at 33 (citing *In re Sullivan*, 135 A.3d 1164, 1173 (Pa. Ct. Jud. Disc. 2016)). Based on the content of the conversations and Appellant's various admissions, the CJD deemed such knowledge to have been readily established. Responding to Appellant's explanations that her rulings were unaffected, the CJD explained:

> Even if Respondent Segal's rulings were the same as they would have been absent the prohibited *ex parte* communications, she purposefully led Waters to believe that his calls influenced her decisions. At a minimum, that approach seems to have led to more *ex parte* communications from Waters seeking to influence Respondent Segal's decisions as shown by Waters' further attempts in *Rexach* and *Khoury*, *after his apparent success in Houdini.*

*Id.* at 33-34 (emphasis in original). The court concluded that Appellant's willingness to engage in repeated *ex parte* communications with Waters and imply she was favoring certain litigants at his behest – thereby encouraging more *ex parte* contacts – had a "deleterious effect upon the administration of justice" and, as such, violated Article V, Section 18(d)(1). *Id.* at 34.

Finally, the CJD found that Appellant had brought her judicial office into disrepute, thus offending the Disrepute Clause of Article V, Section 18(d)(1) of the Constitution. The court observed that such a violation requires conduct that not only affects the reputation of the particular judge, but also tarnishes that of the judicial office itself. *See id.* at 35 (citing *In re Berkhimer*, 593 Pa. 366, 373, 930 A.2d 1255, 1258-50 (Pa. 2007)). It added that the standard implicates the public's reasonable expectations of a jurist's behavior, *see id.* (quoting *Carney*, 621 Pa. at 501, 79 A.3d at 494), and that the assessment is undertaken as if the public is aware of the underlying misconduct. *See id.* (quoting *In re Berry*, 979 A.2d 991, 999-1000 (Pa. Ct. Jud. Disc. 2009)). Viewing Appellant's conduct in its totality, and again focusing in part on Appellant's

failure to disclose the *ex parte* communications to the litigants, the CJD determined that the Board had met its burden in establishing the violation. *See id.* at 35-36.

Appellant filed post-verdict motions, which the CJD denied in a separate opinion. *See In re Segal*, No. 3 JD 2015, *slip op.* (Pa. Ct. Jud. Disc. Sept. 23, 2016). In addition to addressing a series of discrete claims, the CJD responded in general terms to Appellant's criticism of its approach to factual matters:

> In this case we are presented with a judge (Respondent Segal) who engaged in *ex parte* contacts with another judge (Waters) to secretly favor one party over another in three separate cases. Multiple wiretapped calls were intercepted by the FBI between the two wherein they discussed details concerning the favoritism and resultant rulings. Respondent Segal called Waters after each case to let him know she had ruled favorably for the litigant he backed. The transcripts of the intercepted calls and other evidence clearly make out the violations charged. *Other facts become much less significant when the intercepted calls are considered.*

*Id.* at 1-2 (emphasis added).

Along these lines, the CJD did not attach much relevance to Appellant's efforts to highlight the evidence that Waters' *ex parte* contacts requesting favorable treatment for a particular litigant did not alter her decision-making. Rather, the court kept its focus on Appellant's objective misconduct, which it described as "blatantly improper" and "absolutely inexcusable." *Id.* at 2. According to the court, every decision Appellant made in a case affected by such contacts was tainted, and it mattered little whether or not Appellant, in fact, acted upon Waters' overtures. *See, e.g., id.* at 2, 6 (indicating that the violations in question do not follow from Appellant's actual rulings in *Rexach*, *Khoury*, and *Houdini*, but from her "repeated improper *ex parte* contacts, and her assurances to Waters that she would do his bidding").

Additionally, the court addressed Appellant's criticism that it had disregarded the testimony from her character witnesses, reasoning that "the wiretap evidence

undermines any possible finding of innocence." *Id.* at 6; *see also id.* at 6-7 (observing that Appellant's "own words on the wiretaps speak much more convincingly than any claim that she generally has positive traits"). In this respect, the court found that the character evidence would be of greater relevance at the sanctions stage.[6]

Subsequently, the court conducted a sanctions hearing, at which Appellant testified and acknowledged the gravity of her misconduct – primarily in terms of failing to protect the integrity of the judicial process in the three cases in question – and the negative light cast upon her colleagues on the bench. *See* N.T., Nov. 11, 2016, at 9-11, 19; *see also In re Segal*, 151 A.3d 734, 737 (Pa. Ct. Jud. Disc. 2016) (quoting Appellant's testimony in this regard). Additionally, at her request the character testimony from the trial was incorporated into the record.

On December 16, 2016, the CJD issued its opinion imposing the sanction of removing Appellant from office and barring her from serving as a judicial officer in the future. *See id.* at 739. The court considered ten, non-exclusive factors derived from *In re Deming*, 736 P.2d 639 (Wash. 1987). *See Segal*, 151 A.3d at 737-38.[7] The court

---

[6] Appellant lodged other post-verdict objections which the CJD found meritless. *See id.* at 7-8.

[7] The factors are: (1) whether the conduct is an isolated event or part of a pattern of conduct; (2) the nature, extent, and frequency of the acts of misconduct; (3) whether the conduct occurred in or out of the courtroom; (4) whether the conduct occurred in the judge's official capacity or in her private life; (5) whether the judge has acknowledged or recognized that the acts occurred; (6) whether the judge has evidenced an effort to change or modify her conduct; (7) the judge's length of service on the bench; (8) whether there have been prior complaints about the judge; (9) the conduct's effect on the integrity of, and respect for, the judiciary; and (10) the extent to which the judge exploited her position to satisfy her personal desires. *Cf.* Cynthia Gray, *A Study of State Judicial Discipline Sanctions* 81-82 (Am. Judicature Soc'y 2002) (enumerating 39 factors which courts in various jurisdictions have identified as relevant to the selection of an appropriate sanction).

found the application of some of the factors to be mitigating, and it also acknowledged Appellant's sincere remorse. It noted, however, that the proceedings' main purpose is to safeguard the public from judicial corruption rather than to punish the errant judge. The court then concluded, after a review of all of the evidence, that

> we must reject respondent's earlier contention that the problems here were all created by Waters and his corrupt motives. We find nothing in the record which even remotely suggests that Respondent's misconduct was anything but fully voluntary and done to protect her own political welfare. Based on the overwhelming nature of the evidence in this case by way of the wiretapped conversations, and in light of the clear mandates of the canons and constitutional provisions, we conclude that Respondent's conduct shows she knowingly acted in derogation of the judicial canons and, therefore, her actions amounted to willful misconduct.
>
> It cannot be reasonably disputed that Respondent was approached by a corrupt judge. However, rather than refuse to participate in his requests, she complied and willfully engaged in the *ex parte* appeals that he extended. As we have said in more detail in prior decisions, when it comes to corrupt acts and the derogation of a fair and just judicial process, a judge must have "the willingness to stand up for what [is] right and buck a corrupt tide."

*Id.* at 739 (footnote omitted).

## D. Appeal

Presently, Appellant asserts that the CJD's decisions are subject to "plenary review by this Court." Brief for Appellant at 21. Her brief develops that judicial conduct proceedings are quasi-criminal in nature, requiring respondent jurists to be afforded the full panoply of constitutional rights enjoyed by defendants in criminal cases. *See Carney*, 621 Pa. at 505, 79 A.3d at 508. The burden of proof borne by the Board, she explains, is to demonstrate violations by clear and convincing evidence. *See id.* at 493-94, 79 A.3d at 501.

Appellant argues that the CJD deprived her of due process and the presumption of innocence by failing to offer any reasoned consideration of the evidence adduced on her behalf, opting instead to reproduce the Board's proposed factual findings verbatim.[8] In particular, Appellant charges that the court simply ignored her character evidence. While Appellant concedes various of the violations, she adamantly maintains that she did not violate Canons 3A(4) and 3C(1) or the Constitution's Administration of Justice and Disrepute Clauses. She emphasizes that she was never charged with, nor did the court find, that her judicial decisions were affected or altered by her *ex parte* contacts with Waters. It is also Appellant's position that she never benefitted from those improper communications. According to Appellant, the CJD erroneously "created an allegation of case corruption and case fixing and attached it to Judge Segal to justify [her] removal." Brief for Appellant at 18. To the contrary, she asserts, "the record in this case shows Judge Segal was 'an unwitting participant in'" Waters' schemes. *Id.* at 20 (quoting *In re Chiovero*, 524 Pa. 181, 198, 570 A.2d 57, 65 (1990)).

More specifically, with reference to the *Houdini* matter, Appellant claims that the CJD erroneously indicated that she had acted at Waters' request to grant a continuance, which she would not otherwise have done. Here, Appellant focuses on the court's statement that she had "granted the continuance as requested." Brief for Appellant at 22 (quoting *Segal (Findings)*, slip op. at 7). Again, she proffers that such award was eminently consistent with ordinary judicial practices and maintains that there is no evidence of record to support a finding of causation. Similarly, relative to *Rexach*, Appellant contends that the court ignored uncontested evidence that her decision was appropriate and consistent with her usual practices. Further, Appellant asserts that the

_____

[8] Appellant notes that the court's opinion contains typographical errors and repeated misstatements concerning the trial date, derived from the Board's proposed findings.

court erroneously indicated that she had knowledge that the litigant favored by Waters was former judge Roca's son. As to *Khoury*, Appellant contends that the CJD erred in finding that she had told Agent Ruona that "[s]he was more open to the argument of Attorney Fuschino because of his relationship with former Judge Waters and because of the July 23, 2014 call from Waters." *Segal (Findings)*, *slip op.* at 25. Appellant cites to her own contrary trial testimony, which she characterizes as uncontradicted.

Returning to the broader plane, Appellant relates that she has consistently expressed remorse for her conduct and stresses that she self-reported in 2014, cooperated fully with the federal criminal investigation, did not seek legal protection relative to such undertaking, voluntarily appeared before a federal grand jury on the same terms, and cooperated fully with the Board's investigation. She also points to her five-year history on the bench, the absence of prior complaints, and the ample evidence demonstrating that she enjoyed an outstanding reputation as a hard-working, competent, ethical judge. Appellant concludes with a discussion of several other judicial disciplinary cases, including *In re Daghir*, 657 A.2d 1032 (Pa. Ct. Jud. Disc. 1995), *In re Vann*, 1 J.D. 15, *slip op.* (Pa. Ct. Jud. Disc. Dec. 23, 2015), *In re Singletary*, 967 A.2d 1094 (Pa. Ct. Jud. Disc. 2008), *In re DeLeon*, 967 A.2d 460 (Pa. Ct. Jud. Disc. 2008), *In re Berry*, 979 A.2d 991 (Pa. Ct. Jud. Disc. 2009), and *In re Hamilton*, 932 A.2d 1030 (Pa. Ct. Jud. Disc. 2007). She argues that the sanction of removal imposed upon her is disproportionate to the disciplinary action taken in those matters.

## II. Discussion

In the companion case, we have set forth the standard of review pertaining to appeals from disciplinary sanctions imposed by the Court of Judicial Discipline. In this respect, we differ with Appellant's position that our review is plenary in all respects. *See Roca*, ___ Pa. at ___, ___ A.3d at ___.

Certainly, we review challenges to the court's rulings about matters of law on a plenary basis, consistent with ordinary principles of appellate review. Our review of credibility judgments and discretionary determinations, however, is highly deferential, and we bear in mind that the CJD is the tribunal which is expressly authorized under the Constitution to impose lawful discipline upon jurists. *See* PA. CONST. art. V, §18(b); *accord Roca*, ___ Pa. at ___, ___ A.3d at ___ ("[W]e do not substitute our concept of the appropriate penalty for that chosen by the CJD. Rather, we ask whether the sanction is 'lawful.'").

In terms of Appellant's discrete challenges to the factual findings, like the CJD we do not find these to be of controlling significance. The court's main emphasis was on Appellant's knowing participation in improper *ex parte* communications with Waters, encompassing her portrayal, to him at least, that she was willingly accepting his corrupt and corrosive propositioning.

For present purposes, we do not read the Board's findings as reflecting that Appellant rendered any ruling in the three underlying matters other than what she would have made regardless. Rather, our focus, like that of the CJD, rests upon whether the repeated and willing participation by Appellant in *ex parte* communications directed toward debasing the judicial decision-making process – and undertaken with the purpose of gaining favor with the corrupting influence – is sufficient to warrant the sanction of removal.

We conclude that it is. As Appellant candidly acknowledged at the sanctions hearing, her actions are of a kind which are an affront to the administration of justice and diminish confidence in the judiciary at large. *See Segal*, 151 A.3d at 737 (relating Appellant's appreciation that "I know that I reflected poorly on my court and other judges by not protecting the process. . . . I feel awful about the negative light that I've portrayed

my colleagues, who are trying to give justice . . ..").  Significantly, the offending conduct occurred while Appellant was acting in her judicial capacity.  Charged with the responsibility to protect the integrity of the judicial system, the CJD has the discretion to remove those who would repeatedly act intentionally and overtly to degrade the process in such an extraordinary fashion.[9]

Although Appellant's character testimony was mitigating and militated toward leniency, the CJD was not obliged to prioritize it over the interests of the pubic and the judicial system at large.  For our part, we are aligned with the court's overarching conclusion that a judge who repeatedly and intentionally implies she is deciding matters in pending cases based on undisclosed and improper *ex parte* contacts, with the

---

[9] In further reply to Appellant's particularized challenges concerning factual matters, briefly, we do not regard the CJD's statement – that Appellant had "continued the *Houdini* matter as requested," *Segal (Findings)*, *slip op.* at 7 – as reflecting causality.  Rather, in the broader context of the court's explanations that causality was of little relevance to its decision, the statement would appear to be merely that Appellant's decision had been consistent with Waters' request.

With respect to *Rexach*, the CJD's findings do not contain an express credibility judgment as to when Appellant apprehended that the defendant was the son of former common pleas judge Roca.  Rather, such findings only relate that an agent testified that Appellant had said that "maybe Waters had met her in person in a robing room and told her that Rexach was Judge Roca's son."  *Id.* at 18-19.

Similarly, regarding *Khoury*, the court did not specifically credit Agent Ruona's testimony that Appellant said "[s]he was more open to the argument of Attorney Fuschino because of his relationship with former judge Waters and because of the July 23, 2014 call from Waters."  *Id.* at 25.  Rather, the relevant passage of its opinion merely relates that "Agent Ruona testified" to that effect.  *Id.*

In each of these instances, it is apparent that the CJD did not find it necessary to render close factual findings based, *e.g.*, on credibility determinations.  While discrete judgments adverse to Appellant concerning the matters might have been aggravating, the court evidently regarded her acknowledged wrongful conduct to be sufficient, in and of itself, to implicate her removal.

objective to curry favor, exposes herself to being removed from judicial office by the tribunal constitutionally authorized to determine the appropriate sanction.[10] We are not in a position to second-guess the court's assessment concerning the impact upon public confidence of restoring such a judge to service.

In terms of Appellant's criticisms of the CJD's adoption of proposed findings and the brevity of its disposition, the court did not err in borrowing content from the Stipulation and proposed findings, which were prepared and presented for that very purpose. It is sufficient that the court's opinion demonstrates independent judgment, and we believe that it does. In particular, the CJD apparently found it to be so self-evident that the character of Appellant's sustained course of conduct implicated the sanction of removal that there would be little purpose in belaboring the point. There is nothing in its approach to the factual matters or to sanctions that suggests a denial of due process or a disregard of the presumption of innocence, as Appellant alleges.

We proceed to the technical arguments that Appellant did not violate some of the particular ethical directives under review. First, we hold that the CJD was correct in concluding that she violated Canon 3A(4), which prohibits judges from considering *ex parte* communications concerning a pending matter. *See* Code of Judicial Conduct, Canon 3A(4) (superseded). Although Appellant stresses she did not, in fact, act on the acknowledged *ex parte* contacts, thus contending that she did not "consider" them, the court aptly explained that "[t]here is no requirement that the 'consideration' given to the *ex parte* requests be determinative of the errant judge's decision[.]" *Segal (Findings)*, *slip op.* at 28. The recordings of Appellant's conversations with Waters demonstrate that she understood what he was asking for and reported back to him in each instance

---

[10] This is so, in our judgment, even if the appearance of biased decision-making is intended by the judge to be limited to a single other person (here, Waters).

that she had complied with his request.  It is untenable to suggest Appellant had put those requests completely out of her mind in the interim, such that they would not have been "considered" at all.

Second, and contrary to Appellant's position, it is apparent that she violated Canon 3C(1)'s requirement that judges refrain from presiding over cases in which their impartiality might reasonably be questioned.  *See* Code of Judicial Conduct, Canon 3C(1).  Appellant's sole argument on this point is based on the premise that she never acted with partiality, a proposition which we have accepted for decisional purposes, but deem to be immaterial to the fact of an infraction.  By focusing on whether a jurist's impartiality might reasonably be questioned, Canon 3C(1) addresses the broader *appearance* of partiality.  Although examples of violations include proceeding with actual bias, such examples are expressly described in a non-exclusive fashion.  As the CJD explained, the appearance of partiality in the present circumstances is manifest, and no credence is due to the advocacy suggesting to the contrary.

Next, Appellant argues that she did not prejudice the proper administration of justice for purposes of Article V, Section 18(d)(1) of the Constitution.  In this regard, citing to *In re Zupsic*, 893 A.2d 875 (Pa. Ct. Jud. Disc. 2005), she asserts that the CJD has required that a judge proceed with actual bias before a violation may be found.  Again, however, the discussion in *Zupsic* is framed in non-exclusive terms.  *See id.* at 889 (characterizing actual bias as an "example" of conduct which prejudices the administration of justice (quoting *In re Smith*, 687 A.2d 1229, 1238 (Pa. Ct. Jud. Disc. 1996))).  Presently, according to her own stipulations and testimony, Appellant knew that she had been approached by a corrosive influence, yet she remained in her decisional role while acting as if she was acceding to the improprieties.  Litigants can have little confidence that a judge proceeding in this way is rendering fair and impartial

rulings; rather, they may reasonably believe that such a jurist is doing precisely what she said she was doing by engaging in favoritism. Like the CJD, we discern a palpable impact upon the proper administration of justice in these circumstances.

Appellant further maintains that she did not bring the judicial office into disrepute for purposes of Article V, Section 18(d)(1). *See* PA. CONST. art. V, §18(d)(1). For the same reasons, we find to the contrary, as the factual Stipulation alone affords an ample predicate in support of the CJD's determination. Notably, as previously discussed, Appellant herself appropriately recognized the deleterious impact of her conduct on the judicial system and her former colleagues at the sanctions hearing, *see Segal*, 151 A.3d at 737, and we credit this fitting expression of responsibility and contrition over the contrary position advanced in her brief.

Finally, we consider Appellant's contention that the removal sanction is disproportionate to the discipline imposed on other similarly-situated jurists. We have explained in *Roca* that discretionary sanctions decisions of the court are not amenable to a close proportionality assessment, which is not provided for in the Constitution. Rather, it is our task to determine whether the sentence is lawful, which it clearly is on account of the gravity of the conduct and the concomitant prejudice to the proper administration of justice, as well as the fact that Appellant has brought the judicial office into disrepute. *See* PA. CONST. art. V, §18(d)(1). Moreover, in none of the cases referenced by Appellant did a judge repeatedly suggest she was rendering judicial rulings in multiple pending cases based on corrupting overtures.

### III. Conclusion

For the foregoing reasons, the sanction imposed by the CJD was lawful and, as such, we lack authority to disapprove it. Accordingly, the order of the Court of Judicial Discipline is affirmed.

Justices Baer, Todd, Wecht and Mundy join the opinion.

Justice Donohue files a dissenting opinion.

Justice Dougherty did not participate in the consideration or decision of this case.